# Richmond

MARSHALL WRENN, JR., IN HIS OWN RIGHT AND AS ADMINISTRATOR, ETC. V. GRACE WRENN DANIELS.

December 1, 1958.

Record No. 4846.

Present, Eggleston, C. J., and Buchanan, Miller, Whittle, Snead and I'Anson, JJ.

The opinion states the case.

*R. Harvey Chappell, Jr.* (*Wilbur C. Hall; Charles Pickett; Charles W. Laughlin; Pickett, Keith & Mackall; Christian, Barton, Parker & Boyd,* on brief), for the appellant.

*J. Sloan Kuykendall* (*Stilson H. Hall; Henry H. Whiting; Thomas V. Monahan; Peter K. McKee,* on brief), for the appellee.

SNEAD, J., delivered the opinion of the court.

This is an appeal by Marshall Wrenn, Jr., in his own right and as Administrator, c.t.a. of the Estate of Marshall Wrenn, sometimes known as Marshall Wrenn, Sr. from a decree deciding that shares of capital stock in three corporations which Marshall Wrenn, Sr. caused to be issued in his name and that of his son, Marshall Wrenn, Jr., as "joint tenants with right of survivorship" and not as "tenants in common", and funds on deposit in two banking institutions in their joint names were assets of the estate of Marshall Wrenn, Sr., and that Marshall Wrenn, Jr. acquired no title or interest in or to the shares of stock or funds on deposit except such interest as he acquired under the will of Marshall Wrenn, Sr.

Marshall Wrenn, Jr. filed his bill on February 2, 1956 in which he prayed for advice and guidance of the court in the administration of the estate. Grace Wrenn Daniels, sister of Marshall Wrenn, Jr., was made defendant because of her joint interest with Marshall Wrenn, Jr. in the estate of their father, and for the further reason that she claimed as her own certain property in possession of testator at the time of his death.

The bill alleged, *inter alia*, that Marshall Wrenn, Sr., subsequent to the execution of his will on November 17, 1927, caused shares of stock in several corporations which were registered in his name to be reissued and registered in his name and that of complainant as "joint tenants with right of survivorship" and not as "tenants in common"; that he caused his accounts with two banking institutions to be changed in like manner; that the stock certificates were placed in a safe deposit box in Loudoun National Bank, Leesburg, Virginia, rented in his name and that of complainant, to which complainant had a key and free access thereto, and that such acts of his father constituted a gift *inter vivos* which conveyed the legal

title to the securities and deposits subject to being defeated only by death of complainant prior to that of Marshall Wrenn, Sr.

Defendant filed her answer and cross-bill on April 4, 1956 by leave of court. In it she denied that complainant owned any beneficial interest in the securities and deposits, other than as a legatee of the estate of Marshall Wrenn, Sr. She affirmatively averred that if the stocks and bank accounts were held jointly as alleged, they were held in that form solely for the use and benefit of Marshall Wrenn, Sr. and it was not intended to vest beneficial interests in complainant. She prayed that the stocks and deposits be determined as assets of the estate and distributed according to the terms of the will of Marshall Wrenn, Sr.

Complainant filed his answer to the cross-bill on April 20, 1956 and denied that the stocks and deposits were held solely for the use and benefit of Marshall Wrenn, Sr. and were assets of his estate. He affirmatively alleged that the transfers in question were specifically intended by Marshall Wrenn, Sr. to vest beneficial interest therein in him should he survive Marshall Wrenn, Sr. On September 4, 1957, complainant, by leave of court, filed an amended answer to defendant's cross-bill, in which he alleged that he was entitled to the securities and deposits as third party beneficiary of various written contracts entered into between Marshall Wrenn, Sr. and the corporations whose stock was in issue and the institutions which held the funds on deposit.

The evidence was by depositions and stipulations. The court by decree of October 21, 1957 held insofar as material to this appeal, that Marshall Wrenn, Sr. did not make a gift of the shares of stock and of funds on deposit to complainant; that Marshall Wrenn, Sr. did not enter into contracts with the corporations and banking institutions, whereby shares of stock were issued and bank accounts were established in the names of Marshall Wrenn, Sr. and complainant, "as joint tenants with the right of survivorship and not as tenants in common", nor were contracts entered into for the benefit of Marshall Wrenn, Sr. and complainant, or the survivor; that Marshall Wrenn, Sr. procured the issuance of the stock certificates and the establishment of bank accounts for the use, benefit and convenience of himself, and without any intention of making any gift thereof to complainant; that Marshall Wrenn, Sr. died seized and possessed of the securities and bank accounts in question; that complainant did not acquire any title or interest in or to the stocks and

bank accounts except such interest as he acquired under the will of Marshall Wrenn, Sr., and that complainant should proceed to administer and disburse the estate after having procured an appraisal of the stocks and bank deposits.

The litigants will be referred to at times as complainant and defendant in accordance with the respective positions they occupied in the court below, and Marshall Wrenn, Sr. will be referred to at times as decedent.

Marshall Wrenn, Sr. was retired and pensioned by the Standard Oil Company in 1947. His wife, Margaret B. Wrenn, died on January 11, 1949. Thereafter he lived intermittently at his residence in Waxpool, Virginia, which he purchased in 1929 and with complainant and his wife in Fairfax County. The source of his income after retirement was from stock dividends, social security, pension and the sale of eggs on a small scale.

On January 11, 1949, the date of his wife's death, decedent opened a share account with American Building Association (now known as American Savings and Loan Association) of Washington, D. C., in the names of Marshall Wrenn, Sr. and Marshall Wrenn, Jr. "as joint tenants with the right of survivorship and not as tenants in common." The initial deposit was $1,556.38, and the balance was $3,241.16 at the date of the death of decedent.

Decedent caused the following stocks, which were purchased with his own funds, to be issued in the names of "Marshall Wrenn and Marshall Wrenn, Jr., as joint tenants with right of survivorship and not as tenants in common": 83 shares of American Telephone and Telegraph Company on January 25, 1949; 18 shares of Consolidated Natural Gas Company on February 11, 1949; 330 shares of Standard Oil Company of New Jersey on November 21, 1951; 2 shares of Consolidated Natural Gas Company on June 20, 1952, and 20 shares of Consolidated Natural Gas Company on December 8, 1954. Due to a stock split which occurred subsequent to decedent's death an additional 660 shares of Standard Oil Company of New Jersey were issued on February 10, 1956 in their joint names as described on the above certificates. All the transfers were handled by decedent, except the 660 shares of Standard Oil which were issued automatically.

A checking account was opened on October 2, 1951 by decedent with the Loudoun National Bank, Leesburg, Virginia, in the names of "Marshall Wrenn or Marshall Wrenn, Jr., or survivor." The

initial deposit was $306.07, and the balance on deposit at decedent's death was $296.35. Complainant never deposited any of his personal funds in this account or in the account with American Savings and Loan Association. Cards in both instances were presented to complainant for his signature by his father who delivered them to the institutions. Complainant did not withdraw funds except on express direction of his father. On one occasion in 1952 he was told by decedent to withdraw $400 from the account with American Savings and Loan Association, retain $200 and give $200 to defendant as he wanted them to purchase television sets. Complainant apparently considered this transaction as a gift. He was asked on cross-examination: "And you would not have taken it if he had not given it to you?" His response was: "No. Would you take a gift that somebody gave you?"

On January 21, 1952, decedent and complainant rented a safe deposit box in their joint names from the Loudoun National Bank, and the stock certificates were kept there. Complainant had a key to this box.

Marshall Wrenn, Sr. became ill in the summer of 1953, and in September of that year suffered a severe stroke of paralysis. His condition required hospitalization for 5 or 6 weeks. He was rendered speechless and his ability to write was greatly impaired. On October 10, 1953, he executed a power of attorney to complainant, by making his mark in the presence of witnesses at the hospital, authorizing complainant to sign checks and drafts against funds in the Loudoun National Bank and to endorse checks and drafts for deposit or collection. Upon leaving the hospital he returned to his home in Waxpool where he was attended by a nurse. Later decedent spent some time with complainant and his wife at their home. Complainant and his wife were very attentive to decedent both before and during his illness. Defendant has not been a well person since 1938. She did not attend her mother's funeral on the advice of her physician. Defendant testified on cross-examination that she visited her father only on three occasions between August 1953 and July 1954, and when asked why she did not see him more during that period, she replied: "Because I was sick". She stated she visited him during the months preceding his death on an average of once a week. She did not attend her father's funeral because she was sick. While decedent was not a demonstrative person in his affection for his children, yet there was no evidence that he did not love both.

Marshall Wrenn, Sr. died on May 17, 1955. He left surviving a son, the complainant, and a daughter, the defendant.

Later complainant, his wife, defendant and her husband proceeded to Leesburg to secure advice in regard to the settlement of the estate. They first went to Loudoun National Bank where complainant removed the stock certificates from the safe deposit box. They then called on a local attorney. During the conference complainant exhibited the stock certificates to counsel who remarked after an inspection that, in his opinion, they did not constitute a part of the estate, but were the individual property of complainant. Whereupon, complainant sought further reassurance from counsel as to his ownership. Defendant then stated to complainant: "Buzz, you know that Papa put that stock in your name so you could pay the bills if he got sick." Complainant's reply was: "The stock is mine and I can do as I please with it". Defendant remarked that she thought she should employ an attorney to represent her interest and counsel said he thought it advisable for her to do so. The conference ended after agreeing that the stock certificates should be returned to the safe deposit box.

Complainant was asked on cross-examination if he knew what his father's intentions were by causing the stocks and deposits to be placed in their joint names, and his reply was: "No. I mean, he made it as joint tenants in common with rights of survivorship, so I suppose that is what he meant." He further stated he made no inquiries in reference thereto. Later he testified his father "never told me why he did it, and I did not know". Complainant did not use or claim any of the dividends for his personal use. Decedent took complete charge of all dividends and reported them as income in his tax returns. Since decedent's death complainant has paid income taxes on the dividends.

Decedent's will, dated November 17, 1927, was probated and complainant qualified as administrator, c.t.a. on July 19, 1955 in the Clerk's Office of the Circuit Court of Loudoun County. After providing for certain minor bequests, he devised and bequeathed all the rest and residue of his estate to his wife for life, and upon her death to complainant and defendant, "to be divided equally between them, share and share alike".

The inventory and appraisement filed did not include the intangible property in issue. The tangible personal property listed was appraised at $2,487.75 and was sold for $3,284.25. His dwelling and

10 acres of land at Waxpool, Virginia was appraised at $10,500 and was sold for $8,510.

According to complainant his assignments of error present the following questions:

"1. Did Marshall Wrenn, Jr., acquire sole and fee simple ownership of the subject shares of stock and funds on deposit upon the death of Marshall Wrenn, Sr.?

"2. Did the Trial Court err in admitting and considering hearsay evidence of declarations of Marshall Wrenn, Sr., purporting to bear upon his donative intent?

"3. Did the Trial Court err in admitting and considering parol evidence which varied and contradicted the terms of complete, unambiguous, written instruments?"

The first question is the dominant issue presented, but it will be considered along with the other questions for if the court ruled correctly upon the latter then those rulings are determinative of the dominant issue.

Summarized, the testimony of defendant and other witnesses as to declarations of decedent bearing upon his donative intent follows:

Defendant testified that in 1950 her father told her in her apartment in Washington, D. C. that he had made his stock joint with her brother so that in event he became sick her brother could pay the bills; that he had seen how helpless his wife was when she was sick, and that he wanted his bills paid. She quoted decedent as having said: "I have done it for that reason and that reason only."

Tessie Penn Tillett, a next door neighbor of decedent at Waxpool and a close friend at whose home decedent often had meals, stated that decedent told her that he "had his Standard Oil stock changed" so that complainant "could have the power to use the money in case anything happened to him where he couldn't take care of himself." Her recollection was that she first discussed the subject with decedent in 1950. She recalled the approximate time because during that year she and her husband, C. Russell Tillett, had been conveyed real property as tenants by the entirety with right of survivorship as at common law. She said she advised decedent that when he died the stock would become complainant's property, but that he "didn't seem to think that I knew what I was talking about." She also said that decedent stated it wasn't his intention for one to have any more than the other.

Edgar R. Tillett testified that he had discussed with decedent

his stocks on several occasions; that the first conversation in regard to them was in 1952 or 1953; that decedent informed him that the stock was transferred to both names so that complainant "could . take care of his expenses in case he was taken ill and could not do it himself", and that he had heard decedent say that his estate was to be divided equally between complainant and defendant.

C. Russell Tillett stated he advised decedent that upon his death the stocks would pass to complainant, whereupon decedent remarked: "That is not the way it is supposed to be." He further stated that decedent informed him that he transferred the stock so that complainant could take care of him if he became ill, and that at his death it was to be "fifty-fifty" with complainant and defendant. He also stated that decedent told him shortly before he was stricken "he was going to do something about it, he was coming to Leesburg and have them change it, it was not supposed to be that way."

■ In order to make a valid gift *inter vivos*, the donor must intend at the time to make a gift, and there must be such actual or constructive delivery as divests the donor of all dominion and control over the property and invests the donee therewith. *Swan* v. *Swan's Ex'r*, 136 Va. 496, 522, 117 S. E. 858; *Taylor, Administratrix* v. *Smith*, 199 Va. 871, 874, 102 S. E. 2d 160; 24 Am. Jur., Gifts, § 21, pp. 738, 739, 740.

In *King, Ex'x* v. *Merryman, Adm'x*, 196 Va. 844, 86 S. E. 2d 141, Mr. Justice Spratley, speaking for the court, discussed the subject of joint bank accounts in detail and it will serve no good purpose to repeat here what was there said, except to state that absent controlling statutory provision ownership of a joint account must be determined by common law principles, and in so doing the intention of the depositor is a controlling factor. Counsel for complainant point in their brief to a quotation from 38 C. J. S. Gifts, § 50, p. 836 appearing in the opinion, which reads as follows:

"Where the deposit by a person is in the name of himself and another, not his wife, the presumption is that it was done for the purposes of convenience only, and this presumption is strengthened by the illness or infirmity of the depositor."

They contend that no such presumption exists with regard to the transfer of shares of stock to a form of joint ownership. After citing cases, they argue in their brief: "From the foregoing authorities it will be seen that, absent other evidence, where a security on its face clearly creates a survivorship right in a person who did

not pay for the right so created, the security's form will be *prima facie* evidence that an intent to make a transfer of that survivorship interest or right existed at the time the transfer was made." Counsel for defendant agree with that statement of the law and maintain that proof to the contrary must necessarily come from outside the instrument itself.

We said in *Swan* v. *Swan's Ex'r, supra,* pp. 518, 519:

"It is true that Mr. Swan, in making the transfer to her, followed the method which is recognized as legal and regular for the purpose of passing title to shares of stock from one owner to another. He first assigned to her Certificate No. 6 for 175½ shares, and two years later that certificate was surrendered and a new certificate, No. 12, was issued in her name for a like amount. This was exactly the right way to pass title to her. 1 Cook on Corporations (4th ed.), sec. 375. This method of transfer vested the legal title in her and constituted her, *prima facie,* the real owner. In the absence of proof to the contrary, she would thereby become the owner of the stock and could successfully stand on her right to the same against attacks from any source. In such a situation, the case of *Roberts' Appeal,* 85 Pa. St. 84, so confidently relied on by counsel for Mrs. J. V. Swan, would apply.

"But it is quite possible and often happens, for reasons of convenience or otherwise, that stock held in the name of one person really belongs to another. In such a case the certificate, though *prima facie* evidence of ownership in the person to whom it has been issued, possesses no such magic or sacredness as to prevent an inquiry into the facts. Sometimes the transferee is merely a nominal holder or 'dummy,' and in that event, although the transfer may be perfectly regular and complete on its fact (*sic*), the true ownership remains in the transferor, and that fact may be shown. 1 Cook on Corporations (4th ed.), sec. 263; *Id.,* sec. 421."

█ In support of his contention that declarations of decedent subsequent to the transfer were not admissible to prove his donative intent, complainant relies upon *Brock* v. *Brock,* 92 Va. 173, 23 S. E. 224. There in recognizing § 3346, Code 1887,[1] and yet holding that

---

[1] Section 3346, Code 1887, provided in part as follows:

"Second, * * * Where one of the original parties to the contract or other transaction, which is the subject of the investigation, is incapable of testifying by reason of death, insanity, infancy, or other legal cause, the other party to such contract or transaction shall not be admitted to testify in his own favor or in favor of any other person whose interest is adverse to that of the party so in-

declarations made by the grantor after a gift of a bond, which tended to show the donor had not intended to make a gift, were inadmissible, the court stated: "This Court has repeatedly held that the declarations of an assignor, after the assignment, are inadmissible in evidence against his assignee. * * * This was merely hearsay evidence, and there was no error in excluding it."

Here the record discloses that some of decedent's declarations were made as early as 1950 and before most of the transfers were made. Yet regardless of that fact it is important to observe that in the revision of the Code in 1919 section 3346, Code 1887, was omitted and the revisors made material changes in the law governing the competency of witnesses to testify. (See revisors' note to § 6209, Code 1919.) Practically all disqualifications except to safeguard confidential communications were removed, and in order to meet difficulties that might arise from the removal of disqualifications there was added section 6209 (§ 8-286, Code 1950) which provides:

"In an action or suit by or against a person who, from any cause, is incapable of testifying, or by or against the committee, trustee, executor, administrator, heir, or other representative of the person so incapable of testifying, no judgment or decree shall be rendered in favor of an adverse or interested party founded on his uncorroborated testimony; and in any such action or suit, if such adverse party testifies, all entries, memoranda, and declarations by the party so incapable of testifying made while he was capable, relevant to the matter in issue, may be received as evidence."

In the instant case complainant's interest is adverse to that of his father and his estate, and consequently under the statute the alleged donor and alleged donee are adverse parties. The statute is broad in its scope and is not limited in time. Its very purpose is to relax the rule and permit hearsay testimony of this nature under the existing circumstances. The declarations made by decedent were made while he was capable, were relevant to the matter in issue, and he was incapable of testifying by reason of his death.

capable of testifying, unless he be first called to testify in behalf of such last mentioned party; or unless some person, having an interest in or under such contract or transaction, derived from the party so incapable of testifying, has testified in behalf of the latter or of himself as to such contract or transaction; or unless the said contract or transaction was personally made or had with an agent of the party so incapable of testifying, and such agent is alive and capable of testifying."

Since complainant testified, decedent's declarations concerning donative intent were admissible.

For a further discussion of this statute see *Hoge, Adm'r, etc.* v. *Anderson,* 200 Va. 364, 106 S. E. 2d 121, decided today.

■ Under the third question presented complainant contends that if it be argued that the alleged declarations of decedent were made prior to or contemporaneously with the establishment of the bank accounts or the transfers of shares of stock, the testimony of defendant and the Tilletts is prohibited by the parol evidence rule. 7 M. J. Evidence, § 130, *et seq.,* p. 487. He asserts that such testimony varies and contradicts the terms of complete and unambiguous written contracts between decedent and the corporations, and between decedent and the banking institutions, whereby the stocks were issued and the bank accounts were established. He also states that the parol evidence rule applies to the parties and their privies, and that defendant is in privity with decedent, her father.

On the other hand defendant maintains that no complete, unambiguous contracts had ever been executed as between complainant and defendant; that the form of the bank accounts and stock transfers are evidence of contracts existing between decedent and the banks or corporations, but as to the relationship between complainant and decedent, the writings are not a written determination of whether the acts were ones of gift or of convenience; that at most they created a presumption of gift which could be rebutted by other evidence of intent, and that the parol evidence rule is inapplicable because the writings do not describe in absolute terms any definition of the relationship existing between complainant and decedent in regard to the *res.* She further contends that in any event the contract between the banks or corporations and the parties does not preclude use of parol evidence to determine the nature of the relationship existing between the parties themselves, and that the rule preventing contradiction of an instrument by the parties and their privies is not applicable since both complainant and defendant derive their interest because of privity to the same party to the contract.

In *King, Ex'x* v. *Merryman, Adm'x, supra,* at p. 853 the recent case of *Murray* v. *Gadsden,* 91 App. D. C. 38, 197 F. 2d 194, 33 A. L. R. 2d 554 was discussed and we said: "[T]he evidence showed that Emma G. Murray signed an instrument declaring her savings account in a building and loan association to be thereafter a joint account in the name of herself and her sister, Vellmar G. Gadsden,

'subject to order of either, and the balance at death to the survivor.' Upon the death of Mrs. Murray, her sister claimed the balance in the account on the ground that there was an understanding that the sister would share the money with other sisters. The court said, under the principles established by the decisions of the Maryland Court of Appeals, that any interest of Mrs. Gadsden arising upon the death of the depositor was precluded by failure to comply with the statute on wills; that an immediate effective interest was not created by contract or by trust; *that the parol evidence rule did not forbid inquiry into the object of the depositor in executing the writing directing the joint account;* and that the evidence showed that the arrangement had been made merely for the convenience of the depositor." (Italics supplied)

Under the evidence in the present case, the parol evidence rule did not forbid inquiry into the object of the decedent in establishing the bank accounts and in executing the transfers of the shares of stock.

The evidence is ample to sustain the chancellor's conclusions, and the decree appealed from is

*Affirmed.*