## Richmond

NANCY EUGENIA WILKINSON v. JOHN WILLIAM WITHERSPOON, INDIVIDUALLY AND AS CO-EXECUTOR, ETC.

June 14, 1965.

Record No. 5966.

Present, All the Justices.

*George E. Allen* (*Allen, Allen, Allen & Allen*, on brief), for the appellant.

*E. L. Turlington, Jr.*, (*White & Roberts*, on brief), for the appellee.

CARRICO, J., delivered the opinion of the court.

This controversy is between John W. Witherspoon, the complainant, and Nancy Eugenia Wilkinson, the defendant. The litigation arose when the complainant, individually and as co-executor under the will of Oscar O. Hewitt, deceased, filed a bill of complaint against the defendant, individually and as co-executor of the estate.

The bill of complaint sought the advice and guidance of the court in the settlement of the estate. Specifically, the bill was directed to the ascertainment of the ownership of a savings account in the Franklin Federal Savings and Loan Association of Richmond. The account was in the names of the testator, Oscar O. Hewitt, and the defendant, as joint tenants with the right of survivorship. The prayer of the bill was that the court determine whether the balance of $9,703.88 in the account belonged to the estate or to the defendant.

The chancellor heard the case ore tenus and ruled that the savings account belonged to the estate. A final decree was entered directing delivery of the funds to the executors and the defendant, individually, was granted an appeal.

The evidence shows that the complainant and the defendant are brother and sister and were, respectively, the nephew and niece of Oscar O. Hewitt.

Mr. Hewitt was, for more than fifty years, employed as a staff accountant with A. M. Pullen and Company, a public accounting firm of Richmond.

Mr. Hewitt's wife died in December of 1961. On February 1, 1962, he executed his will, dividing his estate equally between the complainant and the defendant and appointing them as co-executors.

On March 2, 1962, the savings account now in dispute was opened by Mr. Hewitt.

Mr. Hewitt retired from his employment in April of 1962. His first entry into the hospital, in connection with his fatal illness, was on September 30, 1962, and he died on November 17, 1962, at the age of 79.

While the evidence discloses that Mr. Hewitt's relationship with his nephew, the complainant, was "pleasant", it shows that his relationship with his niece, the defendant, was close and personal.

When the defendant finished high school in North Carolina, it was at Mr. Hewitt's insistence that she came to Richmond to enter

training to be a nurse. While in training, she often saw him, talked to him on the telephone, and met him downtown for lunch.

This close relationship continued through the years but, after the death of his wife, Mr. Hewitt appeared to rely more heavily upon the defendant for companionship and comfort. He had dinner at her home almost every Sunday. She cooked food and carried it to him at his home, usually once each week.

In April of 1962, following the execution of his will and the opening of the savings account, Mr. Hewitt took an airplane trip to Oregon to visit a sick brother. A few days after Mr. Hewitt's departure, but before his return to Richmond, the defendant received in the mail a flight insurance policy in the sum of $105,000, purchased by her uncle. She was designated as the beneficiary.

On September 30, 1962, when Mr. Hewitt was to enter the hospital for an operation, he telephoned the defendant so to inform her and she and her daughter took him to the hospital. He was discharged on October 14 and the defendant took him to her home for his convalescence. That evening he developed a blood clot and had to return to the hospital.

When Mr. Hewitt was discharged from the hospital on October 27, the defendant took him to her home and cared for him for two weeks. He then went to his own home, where he had arranged for a young couple to stay with him.

While Mr. Hewitt was in the hospital, the defendant visited him every day and took care of his personal needs. During the week after he returned home and before he died, the defendant visited him and telephoned him. In that final week, he wrote a letter to a relative stating that the defendant and her husband "have been wonderful to me, and I can never repay them for what they have done."

The savings account in question was opened by Mr. Hewitt, entirely with his own funds, on March 2, 1962, subsequent to the execution of his will and prior to his retirement. In the eight and one-half months following the opening of the account and preceding his death, Mr. Hewitt made fourteen deposits and no withdrawals.

The account was opened with a signature card executed by Mr. Hewitt and the defendant. The latter testified that, pursuant to Mr. Hewitt's request, she visited him one evening at his home; that he presented her with the card and told her to sign it; that she asked him what the card was for and "he kind of giggled, or laughed, and he said, well, who knows, someday somebody may want to pay some bills"; that she signed the card and left it with him, and that no

other discussion about the matter ever took place between them.

The defendant had no knowledge of the existence of the savings account until after Mr. Hewitt's death. Then, she and the complainant found, in Mr. Hewitt's desk, two safety deposit box keys which were identified as fitting a box in the Franklin Federal Savings and Loan Association. When the box was opened, the passbook to the savings account was found inside. One month and a half after Mr. Hewitt's death, the defendant withdrew the full balance in the account and placed the funds in a new savings account in the savings and loan association in her own name.

The signature card, which is the focal point of this controversy, was, so far as is pertinent here, in the following language:

". . . Hewitt, Oscar O. . . . and Wilkinson, Nancy Eugenia . . . as joint tenants with right of survivorship and not as tenants in common, and not as tenants by the entirety, the undersigned hereby apply for membership and a savings account in the Franklin Federal Savings and Loan Association and for the issuance of evidence thereof in their joint names described as aforesaid. You are directed to act pursuant to any one or more of the joint tenants' signatures, shown below; it is agreed that any one or more such person(s) so authorized shall have power to act in all matters related to this account, including, but without limiting the generality of the foregoing, the withdrawal in whole or in part of this account, and the pledging of this account in whole or in part as security for any loan made by you to one or more of the undersigned. Any such pledge shall not operate to sever or terminate either in whole or in part the joint tenancy estate and relationship reflected in or established by this contract. It is agreed by the signatory parties with each other and by the parties with you that any funds placed in or added to the account by any one of the parties *is and shall be conclusively intended to be a gift and delivery* at that time of such funds to the other signatory party or parties to the extent of his or their pro rata interest in the account.

. . . . . . . . . . . .

"Note: The correct way to establish a common law joint tenancy or its equivalent in any state is to use 'and' in joining tenants' names on all evidence of the account. All tenants should sign this card. . . ." (The italicized language was so emphasized in the signature card itself.)

The sole question to be decided is whether the balance in the

savings account belongs to the defendant or to the estate of Oscar O. Hewitt, deceased.

The issue here presented is not new to this court nor to the courts throughout the country. At the threshold of our discussion, however, we note that never before, in the cases coming before us, have we encountered language in a signature card as comprehensive as in that signed by Mr. Hewitt and the defendant.

The court was first confronted with this type of problem in 1917 in *Deal's Adm'r v. Merchants, &c., Bank*, 120 Va. 297, 91 S. E. 135. There, Martha S. Deal asked a friend to deposit her money in the bank, saying that she did not expect to live long and that when she died she wanted the money to go to her sister, Ellen C. Holland. The money was deposited in the bank to the credit of "Martha S. Deal or Ellen C. Holland", the bank teller explaining, when the deposit was made, that it was a joint account and that either of the parties named could draw the money at any time. Apparently no written memorial of the transaction was made other than the issuance of the passbook. Upon the death of Mrs. Deal, Mrs. Holland produced the passbook and the deposit was changed to her name alone.

In litigation involving the ownership of the money, we upheld the right of the survivor, Mrs. Holland, to the account. The opinion states that it satisfactorily appeared "that this joint deposit was made with the understanding that the balance thereof, not checked out during the joint lives of the two depositors, was to become the property of the survivor." It was held that "the effect of the deposit by Mrs. Deal to the joint credit of herself and her sister was to create a contract relation between the bank and the two joint depositors, under which the amount to the credit of the account became the property of Ellen C. Holland as the survivor of decedent and herself." 120 Va., at pp. 298-299.

Almost forty years passed before a similar question was presented again to the court. In 1955, *King, Ex'x v. Merryman, Adm'x*, 196 Va. 844, 86 S. E. 2d 141, was decided. There, Americus V. Dodson in 1949, when he was in an enfeebled condition, opened a savings account in the bank solely with his own funds. He directed "said account to read A. V. Dodson or Mrs. Lottie King . . . a joint account of myself and daughter . . . and subject to the check of either of us or the survivor." In 1951, Mr. Dodson executed a will leaving all of his property to his seven children, share and share alike. Later in the same year, he died. In a contest between Mrs. King, the de-

signated survivor, and the estate, the latter was held to be entitled to the funds on deposit.

Mr. Justice Spratley, writing for the court, made an exhaustive survey of the case, text and statutory authority upon the subject, drawing from many jurisdictions to present an able discussion of all phases of the problem. It was noted that, in determining the ownership of such accounts, "the intention of the depositor is a primary and controlling factor." 196 Va., at p. 851. The rule was recognized that "where the deposit by a person is in the name of himself and another, not his wife, the presumption is that it was done for the purposes of convenience only, and this presumption is strengthened by the illness or infirmity of the depositor." 196 Va., at p. 856.

It was held that the evidence and the surrounding facts and circumstances all pointed to the conclusion "that the deceased put the savings account in the joint name of himself and daughter as a matter of convenience." 196 Va., at pp. 858, 859.

A similar issue was before the court in 1958 in *Wrenn* v. *Daniels*, 200 Va. 419, 106 S. E. 2d 126. In that case, Marshall Wrenn, Sr., entirely with his own funds, opened a savings account in a building association in the names of himself and his son, Marshall Wrenn, Jr., "as joint tenants with the right of survivorship and not as tenants in common." The father also opened a checking account in a bank in the names of "Marshall Wrenn or Marshall Wrenn, Jr., or survivor." The senior Wrenn further had certificates for stock, purchased solely by him, changed to read "Marshall Wrenn and Marshall Wrenn, Jr., as joint tenants with right of survivorship and not as tenants in common." In his will, the father divided his estate equally between his son and daughter.

Following the death of Marshall Wrenn, Sr., a contest developed over the ownership of the stock certificates and the funds in the savings and checking accounts. The estate of Wrenn, Sr., and not the son, was held to be the owner. The evidence clearly showed that the father intended that his estate should be shared "fifty-fifty" by his children. It was conclusively proved that the accounts and stock certificates were placed in joint names purely for the convenience of the elder Wrenn, so that the son could take care of his father's expenses in case the latter was "taken ill and could not do it himself . . . that he had seen how helpless his wife was when she was sick, and that he wanted his bills paid."

In 1962, the case of *Quesenberry* v. *Funk*, 203 Va. 619, 125 S. E.

2d 869, came before the court. The factual situation was that Walter S. Coalson, who had been ill a long time, opened a savings account in a bank in his name and the name of his daughter, Thelma C. Quesenberry, "jointly, with the right of survivorship." Following Coalson's death, Mr. Quesenberry, the executor under Coalson's will, included the funds in the account as assets of the estate. Mrs. Quesenberry made no claim to the account until an employee of the bank suggested that it belonged to her.

In the litigation which followed, the funds in the account were held to be the property of the estate. All of the testimony showed that the reason Coalson opened the account jointly with his daughter was so that she "could look after his business and keep his bills and everything paid up, and look after his needs."

*Stevens* v. *Sparks, Executrix,* 205 Va. 128, 135 S. E. 2d 140, was decided on March 9, 1964. In that case, the evidence showed that Edward Bascom Stevens had lived separate and apart from his wife for more than thirty years and had twice unsuccessfully tried to secure a divorce from her. Miss Sparks, a nurse, had lived in his home for twenty-eight years, caring for his elderly brothers and sisters. Stevens opened two savings accounts in a savings and loan association and a checking account in a bank in his name and that of Miss Sparks "as joint tenants with right of survivorship, and not as tenants in common." He made a will leaving everything to Miss Sparks and executed a deed conveying his home to her in fee simple.

Following Mr. Stevens' death in an automobile accident, a dispute arose between Miss Sparks and Mrs. Stevens as to the ownership of the accounts. It was shown that Stevens had, on several occasions, stated to an attorney that he wanted Miss Sparks to have the accounts; that he desired that she should have his entire estate, and that "he did not want his wife to get one cent of anything he possessed, but on the contrary Miss Sparks was to have it all." We held that Miss Sparks was entitled to the funds in the accounts.

Thus, it appears that the golden thread of decision running through these cases is that the intention of the depositor is the all-important consideration. Where there was, in the terms of the deposit, a clear expression of an intention that the survivor should become the owner of the account upon the death of the depositor, as in the *Deal* case, the intention was upheld. Where such an intention was not fully disclosed by the terms of the deposit but clearly appeared when the terms were considered along with other evidence, as in the *Stevens* case, effect was given to the intention. But where

a contrary intention was shown to exist, as in the *King, Wrenn* and *Quesenberry* cases, the court did not hesitate to exclude the pretended rights of the survivor.

The case before us has only one element in common with those cases in which the survivors' rights were denied. The language, "as joint tenants with right of survivorship", in the signature card signed by Mr. Hewitt and the defendant, was similar to the terms of the deposits in the other cases. But here the similarity ceases. The signature card now before us, unlike the terms of the deposits in those cases, is fully descriptive of the rights of the parties and contains this crucial language:

" . . . It is agreed by the signatory parties with each other and by the parties with you that any funds placed in or added to the account by any one of the parties *is and shall be conclusively intended to be a gift and delivery* at that time of such funds to the other signatory party or parties to the extent of his or their pro rata interest in the account. . . ." (Emphasis included in the signature card itself.)

The complainant contends that this language is insufficient, in view of the circumstances surrounding the deposit, to constitute the transaction between Mr. Hewitt and the defendant as a gift *inter vivos.* There is lacking, the complainant says, the essential elements of acceptance by the defendant and divesting of control by Mr. Hewitt.

What was said in the *Deal* case is appropriate here. There the court described such a transaction as "a pure contractual relation and no question of gift . . . arises in determining the rights of the parties under such a contract." 120 Va., at p. 299.

We hold that the rights of the parties are to be determined, not by principles applicable to gifts *inter vivos,* but by rules pertaining to the interpretation of contracts. Those rules require us to search for, and give effect to, the intention of the parties. Accordingly, the provisions of the signature card come eloquently into play. That signature card constituted a contract made with the savings and loan association and controlled the terms of the account.

It is here that attention must be given to two statutory provisions which touch upon the question under consideration. Code, § 55-20 abolishes survivorship as between joint tenants. But Code, § 55-21 specifically provides that § 55-20 shall not apply "to an estate conveyed or devised to persons in their own right when it manifestly appears from the tenor of the instrument that it was

intended the part of the one dying should then belong to the others." And it has been held that the provisions of Code, § 55-21 apply to bank accounts. *Johnson* v. *McCarty*, 202 Va. 49, 56, 115 S. E. 2d 915.

The contract here made with the savings and loan association manifested a clear intention on the part of Mr. Hewitt that the savings account should, upon his death, belong to the defendant. That intention resulted in the creation of an express right of survivorship in the defendant, in accordance with the saving features of Code, § 55-21.

In so deciding, we do not overlook what has been said in our previous cases that, in situations similar to the one before us, there arises a presumption that the account was opened for the convenience of the depositor. Here, any such presumption pales in the light of the language of the deposit contract and the circumstances surrounding its excution.

Unlike the *King, Wrenn* and *Quesenberry* cases, the evidence in this case negates the notion that the account was opened by Mr. Hewitt merely for his convenience. At the time the signature card was executed and the deposit made, he was in good health, active and alert, with no apparent concern about his ability to handle his own affairs. And it is a singular fact that the record fails to disclose that, even after he became ill, Mr. Hewitt ever called upon the defendant or anyone else to transact any business or to pay any bills for him.

Mr. Hewitt was a trained accountant with long experience, versed in the intricacies of bank and savings and loan accounts. He was obviously well informed concerning the disposition of estates. A copy of his will is found in the record. Written entirely by his own hand, it is a model of testamentary perfection. It would be eminently unfair to infer that Mr. Hewitt did not know what he was about when he created the survivorship account with the defendant.

On the other hand, it is entirely fair to draw from the evidence the conclusion that Mr. Hewitt deliberately intended to favor his niece, the defendant, over his nephew, the complainant, in the distribution of his worldly goods upon his death. His close attachment to her and her long devotion to him establish abundant reason for his action. And it is significant that the opening of the savings account followed, and not preceded, the execution of his will which, without the opening of the account, would have resulted in an equal division of his estate between his niece and nephew.

The complainant clings to Mr. Hewitt's statement to the defendant, made when she executed the signature card, for support of his argument that the account was opened for the convenience of the depositor. That statement was, "who knows, someday somebody may want to pay some bills." Mr. Hewitt could well have meant the "someday" to be after his death; the "somebody" to be the defendant, and the "some bills" to be her bills, and not his. The statement tends to support, rather than detract from, Mr. Hewitt's intention to create a survivorship account.

We said in *King* v. *Merryman, supra:*

"It seems to be well settled that a bank account may be so fixed that two persons shall be joint owners thereof during their lives, and the survivor take on the death of the other. This may depend upon the terms of the deposit, that is the contract made with the bank, or upon the intention of the depositors as disclosed by their declarations, oral or written." 196 Va., at p. 858.

We welcome the opportunity to say that the savings account now before us is one envisioned by the quoted language. The account here was so fixed that the defendant was entitled to its proceeds upon the death of Mr. Hewitt, in accordance with his declared intention, an intention undimmed by any evidence in the case.

The decree appealed from will be reversed and a final decree will be entered here declaring the defendant to be the true owner of the balance, as of November 17, 1962, of the funds in the savings account opened by Mr. Hewitt on March 2, 1962, in the Franklin Federal Savings and Loan Association.

*Reversed and final decree.*