# Richmond

CLAUDIA ANN ROBBINS, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF B. F. MEGINLEY, DECEASED v. ANNA PEARL GRIMES AND EFFIE V. GRIMES

June 15, 1970.

Record No. 7114.

Present, Snead, C.J., I'Anson, Carrico, Gordon, Harrison and Harman, JJ.

*Robert R. MacMillan (David K. Sutelan; Breeden, Howard & MacMillan*, on brief), for appellant.

*Alfred Bernard, III (P. A. Agelasto, Jr.*, on brief), for appellees.

HARMAN, J., delivered the opinion of the court.

Claudia Ann Robbins, individually and as Executrix of the Estate of B. F. Meginley, deceased, instituted this action by a Bill of Complaint against Anna Pearl Grimes and Effie V. Grimes, seeking a declaratory judgment as to the ownership of an account represented by Atlantic Permanent Building and Loan Certificates in the total amount of $19,100 standing in the name of "B. F. Meginley or Anna Pearl Grimes" on July 21, 1966, the date of B. F. Meginley's death. These certificates were reissued on September 20, 1966, by Atlantic, pursuant to direction by Anna Pearl Grimes, in the names of Anna Pearl Grimes and Effie V. Grimes.

The trial court, after hearing the evidence *ore tenus*, entered a final decree finding in favor of the respondents, Anna Pearl Grimes and Effie V. Grimes, on the ground that there was a gift *inter vivos* of the account to Anna Pearl Grimes. Complainant sought and was awarded an appeal from this decree.

The evidence discloses that Anna Pearl Grimes was employed by him for more than 45 years as his bookkeeper and office secretary. The evidence established that the certificates evidencing the account were issued in three separate transactions during the last six months of 1960.

The crucial evidence regarding the establishment of the account is provided by Paul Smith, who was then a vice-president and a director of Atlantic. B. F. Meginley, the deceased, came to Smith's office sometime in the summer of 1960 and advised Smith that he wanted to establish a joint account with Atlantic in the names of "B. F. Meginley or Anna Pearl Grimes." When questioned by Smith as to his purpose in opening the account in that way, Meginley said, "Well, at my death I would like Miss Grimes to have this money but I still want to control the money and I will take the certificates and put them in my safety deposit box."

Smith further testified that Meginley stated, in making this arrangement, that it was ". . . for the purpose of compensating her for his lack of being able to give her the proper raises and salary that she should have been getting—that he hadn't been able to pay her and this was in turn to compensate her for that." Meginley indicated to Smith that he expected to receive the dividends on the the account during his lifetime and the evidence shows that he did receive such dividends and reported them for tax purposes.

Pursuant to this understanding between Meginley and Smith, an account was established on July 5, 1960, and the initial deposit of $16,000 was made. Two additional deposits were made, one on July 8, 1960, in the amount of $1,100, and another on December 13, 1960, in the amount of $2,000, so that the total account amounted to $19,100.

The evidence establishes that certificates were prepared and delivered to Meginley in each instance and that he, contrary to his earlier expressed intention, delivered the certificates to Anna Pearl Grimes, who placed them in a lockbox at her home and retained them until after Meginley's death.

When the first certificates were delivered by Meginley to Anna Pearl Grimes, Meginley said "This is yours and no one can take it

from you, come what may, and you keep it and at my death you take it and put it in your name because it's for your retirement". There are no corroborating witnesses to the actual delivery of the certificates by Meginley to Miss Grimes, but Effie V. Grimes, a sister of Miss Grimes, did corroborate that the certificates were brought home by her sister on each of three occasions and remained there until after Meginley's death.

Under the by-laws of Atlantic, it was necessary to surrender the certificates in order to make a withdrawal from the account, a fact that was known to Meginley who was a longtime customer of Atlantic.

In 1965, in order to get its signature cards "to a new system and also to get cards on those accounts" for which it did not have signature cards, Atlantic mailed a letter to all accounts. The letter mailed to the holders of "joint accounts" read as follows:

"In an attempt to make more efficient our present system of handling savings accounts signature cards, we at the Atlantic Permanent ordered new signature cards for each type of savings account. You presently have a joint account for which you will find the new signature card enclosed. Please both of you sign the new signature card and return it to us.

\*     \*     \*

"It is our hope that you will feel free to call on us concerning any questions you may have or for any assistance you may need."

Such a letter was mailed to Meginley and Anna Pearl Grimes. In response to this letter of April 19, 1965, a card was received by Atlantic bearing the signatures of Meginley and Anna Pearl Grimes. This signature card reads as follows:

". . . Meginley B. F. and . . . Grimes Anna Pearl . . . as joint tenants with right of survivorship and not as tenants in common, and not as tenants by the entirety, the undersigned hereby apply for a savings account in Atlantic Permanent Savings and Loan Association and for the issuance of evidence thereof in their joint names described as aforesaid. You are directed to act pursuant to any one or more of the joint tenants' signatures, shown below, in any manner in connection with this account and, without limit-

ing the generality of the foregoing, to pay, without any liability for such payment, to any one or the survivor or survivors at any time. This account may be pledged in whole or in part as security for any loan made by you to one or more of the undersigned. Any such pledge shall not operate to sever or terminate either in whole or in part the joint tenancy estate and relationship reflected in or established by this contract. It is agreed by the signatory parties with each other and by the parties with you that any funds placed in or added to the account by any one of the parties *are and shall be conclusively intended to be a gift and delivery* at that time of such funds to the other signatory party or parties to the extent of his or their pro rata interest in the account . . ."

The trial court based its ruling below on the theory of a gift *inter vivos* of the certificates representing this account from Meginley to Anna Pearl Grimes.

Complainant argues that this is error and that we should reverse since the evidence is insufficient to establish such a gift *inter vivos*.

We do not hesitate, in a proper case, where the correct conclusion has been reached but the wrong reason given, to sustain the result and assign the right ground. *Eason* v. *Eason*, 204 Va. 347, 352, 131 S.E.2d 280, 283 (1963); *City of Richmond* v. *Grand Lodge*, 162 Va. 471, 475, 174 S.E. 846, 847 (1934); *Hogg* v. *Plant*, 145 Va. 175, 182, 133 S.E. 759, 761 (1926). We find this to be such a case.

The rights of the parties to a joint bank account where a signature-card contract has been signed, such as the one before us, are not to be determined by the principles applicable to gifts *inter vivos* but by rules pertaining to the interpretation of contracts. *Campbell* v. *Campbell*, 211 Va. 31, 175 S.E.2d 234 (1970), this day decided; *Wilkinson* v. *Witherspoon*, 206 Va. 297, 142 S.E.2d 478 (1965).

We hold that the account in issue is of the same character as the accounts in *Wilkinson* and *Campbell* and, under the terms of the signature-card contract, is rightfully the property of the surviving joint tenant, Anna Pearl Grimes.

*Affirmed.*