### Richmond

LEGUM FURNITURE CORPORATION, ET AL., ETC. V.
DAVID I. LEVINE.

DAVID I. LEVINE V. ROBERT M. STEIN,
EXECUTOR, ETC.

March 4, 1977.

Record Nos. 760161 and 760146.

Present, All the Justices.

*Thomas H. Willcox, Jr. (James C. Howell; Willcox, Savage, Lawrence, Dickson & Spindle, P.C.,* on brief), for plaintiffs in error in Record No. 760161.

*James W. Jones (Sidney Dickstein [D.C.]; Leslie J. Ruben [D.C.]; Dickstein, Shapiro & Morin [D.C.],* on brief), for defendant in error in Record No. 760161.

*James W. Jones (Sidney Dickstein [D.C.]; Leslie J. Ruben [D.C.]; Dickstein, Shapiro & Morin {D.C.],* on brief), for plaintiff in error in Record No. 760146.

*Thomas H. Willcox, Jr. (James C. Howell; Willcox, Savage, Lawrence, Dickson & Spindle, P.C.,* on brief), for defendant in error in Record No. 760146.

HARMAN, J., delivered the opinion of the court.

This appeal is from the final orders of the trial court, sitting without a jury, after a consolidated hearing on the issues in two law actions. The trial court granted judgment in favor of David. I. Levine (Levine) in the actions filed against him by Legum Furniture Corporation, assignee of Harry Weisberg and Sam Weisberg (the Weisbergs), and Robert M. Stein, Executor of the estate of Jack Stein, deceased (the executor). In his action the executor sought to recover the sum of $32,384.50 which he alleged was advanced by Jack Stein (Stein) and later by the executor on Levine's behalf in a joint venture. The Weisbergs sought to recover a similar amount which they alleged they advanced on Levine's behalf in the same joint venture. Judgment was entered in favor of the executor on Levine's counterclaim for $42,346.75 which Levine alleged he "erroneously paid" to the executor, who was not "entitled to receive said sum or any part thereof under the contract" between the joint venturers.

All parties agree that Levine, Stein and the Weisbergs entered into a joint venture in 1961 to acquire, develop and sell two parcels of land aggregating more than 100 acres in Princess Anne County (later merged into the City of Virginia Beach). The initial agreement between the joint venturers is memorialized by a written contract dated December 21, 1961.[1] In 1962 Ocean Bay Development Corporation (Ocean Bay) acquired title to one of the two tracts of land which were under option to the joint venturers.

---

[1] "THIS AGREEMENT, dated this 21st day of December, 1961, by and between DAVID I. LEVINE, first party, JACK STEIN, second party, and SAM WEISBERG and HARRY WEISBERG, third parties.

"WHEREAS, the parties hereto have this date formed OCEAN BAY DEVELOPMENT CORPORATION, a Virginia Corporation, for the purpose of purchasing a tract of land in Princess Anne County, Virginia, containing 100 acres more or less, and

"WHEREAS, the parties are desirous of setting forth their respective agreements in relation to said property and to restrict the sale of the stock in OCEAN BAY DEVELOPMENT CORPORATION;

"NOW, THEREFORE, for and in consideration of the mutual covenants hereinafter contained, the parties do agree with each other as follows:

"1. First party shall receive 4 shares of common stock in said OCEAN BAY DEVELOPMENT CORPORATION, said sum representing 50% of the outstanding stock of said corporation, to be issued for and in consideration of his locating the property being purchased, his negotiating of the purchase of said property at a satisfactory price,

In 1963 a second corporation, Marina Acres, Inc., was formed. This corporation, described as a "conduit" for tax purposes, acquired title to the land from Ocean Bay and simultaneously deeded an undivided one-half interest therein to Levine, an undivided one-fourth interest therein to Stein and an undivided one-fourth interest therein to the Weisbergs. While both corporations were dissolved in 1963, the parties agree that the rights and obligations under the 1961 agreement were to "flow through [the corporations] to the individuals." In 1965 the second

and for his future services to be rendered in and about the development, promotion and ultimate sale of the said property, and thereafter First party agrees to invest or loan 25% of the total amount of loans or capital investments by the parties hereto.

"2. Second and third parties shall each own 25% of the outstanding stock of said corporation, representing two shares for each party.

"3. All parties agree that they shall be responsible for the securing of all additional capital that may be needed for the development and promotion of the property, and shall make every reasonable effort to secure adequate financing from banks or other lending institutions, and will agree to personally endorse any and all indebtedness of the corporation in order to secure said financing, and shall issue financial statements and any other lawful representations required for the purpose of securing said loan or loans from time to time.

"4. Although first party shall be responsible for placing in the corporate treasury only 25% of the personal funds for financing corporate activities at its inception, he shall be personally responsible for 50% of the loss, if any, sustained by the corporation as the result of its activities, and shall use every reasonable effort to help secure financing that may be required by the corporation, but shall not be required to endorse any note or notes for the securing of said financing unless the lending institution requires said personal endorsement.

"5. Whereas the second and third parties have both indicated their desire to assign a portion of their stock to other parties, and it is to the best interests of OCEAN BAY DEVELOPMENT CORPORATION that said assignment be made with certain restrictions thereon, it is hereby agreed that the assignment of any stock by any of the parties hereto shall be done only with the express provision that said stock shall be voted only by the parties to this agreement and no other, and the assignees of said stock shall have no voice in the activities of the corporation nor shall they be permitted at either stockholders or board of directors meetings, nor shall the officers or directors of said corporation be answerable in any respect to said assignees. All stock rights of the assignee shall be deemed vested in the assignor thereof.

"6. First party shall be permitted to withdraw in the form of dividends, a reasonable sum from time to time as he shall deem necessary, provided said sum shall not at any time exceed his prorated share of the net profits of the corporation as of the date of the withdrawal.

"7. The parties hereto agree that if either of the three parties hereto desire to sell his share or any part thereof and has received a bona fide offer in writing from any party not a party to this agreement, the said selling party shall first offer the other two parties to this agreement his share to be sold at the offering price and if the other two parties do not purchase same collectively, then the remaining party shall have the privilege of purchasing same individually.

"WITNESS the following signatures and seals"

[Signatures deleted]

parcel was acquired in the same undivided shares by the joint venturers.

The total purchase price for the land was $500,000. Under the agreement with the sellers, most of the purchase price was deferred. This deferred purchase money was payable in annual installments, with 5% interest on the unpaid balance. The last installment became due in 1972. Between 1962 and 1972 the initial payments and the installments of deferred purchase money, with accrued interest, were paid as due.

Since the joint venture had no income and did not sell any of its property until December, 1971, the joint venturers provided the money to make the deferred payments as they became due. In making the initial payments on the property and in making the deferred payments, the Weisbergs contributed $37^{1}/_{2}$% of the required amount, Stein, prior to his death in 1970, and his executor thereafter, provided $37^{1}/_{2}$% of the funds and 25% was furnished by Levine. Between 1962 and 1972 a total sum of $585,000, representing the $500,000 purchase price and $85,000 in interest, was paid to the sellers by the joint venturers. Of this total sum, $219,375 was contributed by the Weisbergs, $219,375 was provided by Stein and his executor and $146,250 was paid by Levine. Thus it appears that the Weisbergs contributed $73,125 more than 25% of the funds used in the joint venture and Stein and his estate contributed a like amount.

Prior to the controversy leading to this litigation, Levine paid, from his share of the proceeds of land sales, $42,346.75 to the Weisbergs and $42,346.75 to the executor. In April, 1973, Levine tendered $20,153.25, the difference between the payments which he had made and $62,500, to the Weisbergs and a like amount to the executor on condition that Levine receive a release acknowledging full repayment of his obligations to them. The Weisbergs and the executor, claiming that Levine was obligated to pay to each the difference between the amounts already repaid and the $73,125 [2] which each had advanced in excess of their 25% share in the joint venture, declined the tender.

---

[2] The $73,125 figure included both the principal installments and interest paid to the sellers on Levine's behalf in satisfaction of installments of deferred purchase money. The $62,500 figure, upon which Levine predicated his offer, represented principal payments advanced on Levine's behalf and did not include interest. If Levine is liable for the principal advanced on his behalf, he is also liable for the interest advanced.

Here, as in the trial court, the executor and the Weisbergs contend that each of the joint venturers is entitled to receive his pro rata share of any money received by the joint venture until such time as all sums paid or advanced on behalf of the joint venture have been fully paid. Only then, they contend, do profits accrue to be divided as provided by the joint venture agreement. Levine, to the contrary, argues that the December, 1961, agreement makes no provision for repayment of the sums advanced by the joint venturers. He relies on the language in paragraph numbered one of the agreement to sustain his claim that the additional sums paid by the Weisberg and Stein interests were compensation to him for locating the property, negotiating its purchase and promoting and developing it for sale, a contention with which we do not concur.

Levine testified below, and argues here, that the sums totaling $42,376.75 which he paid to the executor prior to this controversy were not in repayment of a legal obligation but, in fact, were conditional gifts which should be returned to him. He says this is so because the condition of those gifts, that no demand would be made upon him for more than $62,500, being the excess sum beyond Stein's pro rata share which the executor and Stein contributed to payment of principal for land purchasers, has been violated by the executor.

The trial court, because the contract did not expressly so provide, held that no repayment of sums contributed by the co-venturers was required by the contract, thus it denied recovery to the executor and the Weisbergs. It also held that the sums paid by Levine to the executor and the Weisbergs prior to the controversy were *inter vivos* gifts which Levine was not entitled to recover.

We think it unnecessary to review in detail the lengthy *ore tenus* evidence heard by the court below for we think the court erred in its initial holding that no repayment of the sums advanced to the venture by the joint venturers was required under the contract.

Joint adventures are not established by operation of law, but are created by contract, express or implied. Little formality is required. The conduct of the parties, as well as other facts and circumstances of a particular case, will often justify the inference that such a contract exists. *Smith, Adm'r.* v.

*Grenadier,* 203 Va. 740, 744, 127 S.E.2d 107, 110 (1962); *Wells* v. *Whitaker,* 207 Va. 616, 626, 151 S.E.2d 422, 430-31 (1966). In 46 Am. Jur. 2d *Joint Ventures* § 8, citing *Smith, Adm'r.,* it is pointed out:

> "Little formality is required to establish a joint venture, and an agreement therefor is not invalid because of indefiniteness in respect to its details. The contract need not particularly specify or define the rights and duties of the parties. . . ." (Footnotes omitted)

and at 46 Am. Jur. 2d *Joint Ventures* §§ 36, 37, it is noted:

> "The rights, duties, and obligations of joint venturers and of members of syndicates, as between themselves, depend primarily upon the terms of the contract by which they assumed that relationship. They are also affected, however, by certain general principles which operate in the absence of specific provisions in the contract, or sometimes in conjunction with such provisions. These principles, as has already been pointed out, are much the same as, or at least are clearly analogous to, those which govern the relations of partners. . . . (Footnotes omitted)
>
> "The general rule applicable to dissolution in the case of a joint venture is that in the absence of an express agreement to the contrary, the person advancing capital is entitled to its return before there is a division of income or profits. . . ." (Footnotes omitted)

It is the established rule in Virginia that in the absence of an agreement, express or implied, between partners in respect to their shares in the profits and losses of the business, they are to share equally, although they may not have contributed equally to the partnership capital. But while this is the general rule as to profits and losses, it is not the rule as to the division of the partnership capital which, in the absence of an agreement to the contrary, express or implied, will be returned to the partners in the proportion contributed by them. *Smiley* v. *Smiley,* 112 Va. 490, 492, 71 S.E. 532, 533 (1911).

We hold that the same rule applies between joint venturers. Here the contract between the joint venturers provided the percentage of funds to be contributed to the venture by each of

the joint venturers but is silent in respect to a return of those capital funds when the venture was dissolved or terminated. Under paragraph numbered one of the 1961 agreement, Levine was entitled to acquire 50% of the stock in the Ocean Bay, the corporate form which the venture first took. Stein and the Weisbergs were each entitled to purchase 25% of the stock. Thus, Levine became entitled to receive 50% of any profits of the venture, and the Weisbergs and Stein each became entitled to 25% of the profits. Paragraph numbered four of the agreement provides that Levine "shall be personally responsible for 50% of the loss, if any, sustained by the corporation as a result of its activities." Clearly, had the venture been unsuccessful, Levine would have been responsible to account to his co-venturers for the losses they sustained in excess of their pro rata share. As is pointed out by the executor and the Weisbergs, there is no profit to divide until the capital cost of the property acquired by the venture has been recovered and repaid.

We, therefore, reverse and set aside the judgments of the trial court denying recovery to the executor and the Weisbergs on their claims against Levine and separate final judgments of $30,778.25 will be entered here against Levine, one in favor of the executor and the other in favor of the Weisbergs. We affirm the judgment of the trial court in favor of the executor on Levine's counterclaim as the correct result was reached but for the wrong reason. *Kessler* v. *Doctors Hospital,* 212 Va. 497, 504, 185 S.E.2d 43, 47 (1971); *Robbins* v. *Grimes,* 211 Va. 97, 100, 175 S.E.2d 246, 248 (1970).

*Affirmed in part, reversed in part and final judgment.*