Alma Lage, demandante y recurrente, *v.* Central Federal Savings and Loan Association, demandado y recurrido.

*Número:* R-78-275      *Resuelto:* 28 de noviembre de 1978

74

*Jorge Luis Ortiz Viera,* abogado de la recurrente; *Juan E. Nieves Mora,* abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Todo estudioso del derecho reconoce que la génesis de las normas legales que rigen en una sociedad corresponde e intenta tutelar, en sus variadas manifestaciones, fenómenos que arrancan de la naturaleza humana. En el campo civilista, observa un autor: "Cada institución jurídica descubre en su fondo una faceta del alma humana. Unas, como el préstamo

usurario, la codicia; como el comodato, el sentimiento de amistad y ayuda; otras, como la renta vitalicia, la seguridad ante el porvenir; otras, como el seguro, el temor a la ruina, etc. Pero ninguna como la donación descubre el aspecto más puro de nuestros sentimientos: la bondad. Por ella el hombre se manifiesta despojado del lastre de las sensaciones innobles; muestra su corazón sin repliegues ruines, y se manifiesta a sus semejantes bajo el propio signo de la humanidad." Puig Peña, F., *Tratado de Derecho Civil Español*, Tomo IV, Vol. II, 189 (1973).

Este recurso nos obliga a examinar e interpretar la calificación jurídica de un acto denominado por sus ejecutores "donación". Su importancia radica en el uso frecuente que se le da actualmente en la industria bancaria al ahorro depositado en cuentas denominadas "con tenencia mancomunada y derecho a sobrevivencia" (*joint tenants with right of survivorship*). Al enfrentarnos a esta tarea, recordamos que "[e]l concepto donación es tan simple en apariencia como difícil de precisar . . . [y] ha de estudiarse sin perder de vista que se trata de un concepto jurídico forjado por la necesidad de salvaguardar los intereses que merecen protección por encima del interés o beneficio del donatario, incluso a pesar o en todo caso con independencia de la voluntad inicial del donante." Puig Brutau, *Fundamentos de Derecho Civil*, Tomo II, Vol. 2, 59 (1956).

## I

Expongamos los hechos. El 24 de abril de 1972 Ramiro Giraud Martínez abrió una cuenta de ahorros número 6485 en el *Central Federal Savings*, sucursal de Lares, identificada como "tenencia mancomunada y derecho de sobrevivencia" (*joint tenants with right of survivorship*),[1] haciendo figu-

---

[1] La tarjeta preimpresa suplida por el Banco, suscrita disponía en lo pertinente:

"*. . . como tenedores solidarios con derecho a sobrevivencia* y no como tenedores mancomunados ni como tenedores en común pro indiviso, los sus-

rar a su sobrina Alma Lage cotitular de la misma. Como para dicha fecha ella residía en Miami, Florida, él le envió la tarjeta sobre contrato de depósito la cual firmó y le devolvió. Según atestado por la propia sobrina, es incontrovertible el hecho de que las intenciones de su tío respecto a los fondos depositados eran que al éste morir, el dinero pasara a ser de su propiedad. (2) Mientras estuvo vigente la cuenta únicamente se nutrió de depósitos efectuados por Giraud, él mantuvo bajo

---

cribientes por la presente solicitan abrir una cuenta de ahorros en el CENTRAL FEDERAL SAVINGS AND LOAN ASSOCIATION OF PUERTO RICO y que se provea evidencia a tales efectos a nombre de los antedichos tenedores solidarios. Se les instruye para que efectúen en dicha cuenta las transacciones que los suscritos tenedores *les autoricen mediante una o más de sus firmas, y sin limitar el carácter general de lo anterior, se les instruye para que, en cualquier momento, sin responsabilidad alguna por el mismo, hagan un pago a favor de cualquiera de los cotenedores sobrevivientes.* Esta cuenta podrá pignorarse total o parcialmente como garantía de cualquier préstamo concedídole por ustedes a uno o varios de los suscribientes. Cualquier pignoración de este tipo no ocasionará la división total o parcial de la propiedad ni pondrá fin a la relación solidaria reflejada o establecida en este contrato. *Los suscribientes acuerdan entre sí y con ustedes que todos los fondos depositados o agregados a la cuenta por cualquiera de las partes son y serán considerados una donación y transferencia a las otras partes, a ser prorrateado en ese momento entre ellas en la medida de su interés en la cuenta.* Se les autoriza a aceptar cheques y efectos similares para depositar a esta cuenta, independientemente de que sean pagaderos a una o más de las partes, y a proveer cualquier endoso que sea necesario. Se les releva de toda responsabilidad que surja en relación con el cobro de los efectos manejados por ustedes sin negligencia, con los actos de sus agentes, subagentes u otras personas, y con cualquier contingencia. No se podrán hacer retiros contra dichos efectos hasta tanto éstos hayan sido cobrados, y cualquier cantidad no cobrada podrá ser cargada a esta cuenta, incluyendo los gastos en que se haya incurrido. Cualquier gasto adicional en que se incurra en relación con esta cuenta podrá ser cargado a la misma. Se autoriza al comité oficial de delegados de esta institución (proxy committee) para que en lo sucesivo, en ausencia nuestra y durante cualquiera de sus reuniones, emita el voto o votos que nos corresponda hasta tanto este poder sea cancelado por escrito." (Traducción y subrayado nuestro.)

(2) La única prueba de carácter testifical que desfiló ante el tribunal de instancia consistió del testimonio de la demandante recurrente que mereció entero crédito a dicho foro. Se sometió prueba documental, incluyendo una deposición tomada a tres funcionarios de la institución recurrida.

su posesión la libreta acreditativa de los valores, y en vida de éste, su sobrina se abstuvo de hacer retiro alguno.

Aproximadamente dos años después, el 14 de agosto de 1974, Giraud Martínez falleció intestado y sin dejar herederos forzosos. Oportunamente, como únicos y universales sucesores fueron judicialmente reconocidos sus siete hermanos nombrados Amparo, Rafael, Alicia, José, Erlinda, Adrián y José Ramón.

A los cuatro días de su muerte, el 17 de agosto de 1974, su sobrina Alma acompañada de su madre Amparo Giraud y dos tíos, se personaron en el Central Federal Savings, donde solicitaron y obtuvieron el retiro de la suma de $500.00 de la cuenta de ahorros existente. Posteriormente, el 4 de noviembre de ese año, Alma Lage gestionó y le fue entregada la suma adicional de $3,312.50. Ambas cantidades totalizaban el 25% de los fondos existentes en la cuenta al momento de la muerte de Giraud Martínez.[3]

Subsiguientemente en 22 de enero de 1975, la Sucesión compuesta por los hermanos del occiso pidió y extrajo la totalidad del remanente ascendente a $12,072.74 que permanecía en la referida institución bancaria, cerrándose la cuenta de ahorros. Tal entrega se verificó luego de haberle sido presentado al banco los documentos relativos a la declaratoria de herederos de Ramiro Giraud Martínez y la "cancelación de

---

[3] La entrega de estas sumas de dinero se hizo conforme lo autorizado en la "Ley de Contribuciones sobre Caudales Relictos y Donaciones de Puerto Rico" que dispone:

"(a) (2) *Personas dedicadas al negocio bancario*—Ninguna institución bancaria o persona alguna dedicada a negocio similar, entregará a los herederos, legatarios o beneficiarios de un causante los fondos depositados en ella a nombre del finado, o de éste y otra persona conjuntamente, cantidad alguna en exceso de quinientos (500) dólares o del veinticinco (25) por ciento del total de dichos fondos, cualquiera de las dos cantidades que sea mayor, a menos que se autorice por el Secretario una entrega por mayor cantidad, de acuerdo con lo provisto en la sec. 5312 de este título, o que se presente al banco la cancelación de gravamen provisto en la sec. 5433 de este título." (13 L.P.R.A. sec. 5436.)

gravamen" expedida por el Departamento de Hacienda. (⁴) Alma Lage no estuvo de acuerdo con esta actuación y requirió infructuosamente del Banco la entrega de la cantidad de $12,072.74, alegando su preferencia debido a su condición de cotitular, bajo los términos del contrato de depósito—de tipo mancomunado con derechos al sobreviviente—que estipulaban su dación al sobreviviente.

El 2 de mayo de 1975 radicó demanda contra el Central Federal Savings, solicitando dicha suma más $10,000.00 en concepto de daños. La institución bancaria contestó negando la procedencia de la reclamación y formuló reconvención requiriéndole la devolución de $3,812.50 entregádosle por inadvertencia. Oportunamente el tribunal dictó sentencia declarando sin lugar la demanda y con lugar la reconvención. Concluyó que la intención del occiso había sido hacer una donación a la demandante para ser efectiva a su muerte y que como tal debía regirse por las formalidades y disposiciones pertinentes relativas a la última voluntad de una persona; al no concurrir éstas, no hubo donación, y por tanto, la recurrente nunca adquirió el derecho pretendido.

No conforme, presentó solicitud de revisión en virtud de once (11) errores que se pueden compendiar en dos: (⁵) apre-

---

(⁴) Este último documento acredita que la obligación contributiva garantizada por un gravamen sobre el caudal relicto de una persona fallecida —que adviene *de jure* y asegura su pago—ha sido totalmente satisfecha o se ha provisto para su adecuado cumplimiento. (13 L.P.R.A. sec. 5438.)

(⁵) Específicamente alega la comisión de errores sobre los siguientes extremos: "(1) omitir en la relación del caso de su opinión y sentencia el hecho, no controvertido, de que el demandado-recurrido hizo entrega a la recurrente de la suma de $3,812.50 con anterioridad a la negativa de entregar el remanente; (2) determinar como un hecho probado el que el Sr. Ramiro Giraud Martínez abrió la cuenta de ahorros objeto de la demanda haciendo figurar a la recurrente como 'joint tenant' en dicha cuenta; (3) determinar como hechos probados el que el Sr. Ramiro Giraud Martínez abrió la cuenta de ahorros objeto de la demanda en este caso y luego de ello envió el impreso y tarjeta para la firma de la recurrente, no siendo ello así; (4) determinar como cuestión de derecho el que la cuenta de ahorros objeto de la demanda en el presente caso y el dinero en ella depositado era de la exclusiva y entera propiedad de Don Ramiro Giraud Martínez

ciación equivocada de la prueba y aplicación errónea del derecho. Expedimos orden de mostrar causa, y oportunamente compareció el demandado recurrido.

Los señalamientos referentes a la apreciación de la prueba son infundados. Hemos examinado la totalidad de los autos y estimamos que las determinaciones de hecho consignadas por la ilustrada sala sentenciadora tienen apoyo suficiente en la prueba testifical y documental desfilada. *Torres Pérez* v. *Colón García*, 105 D.P.R. 616 (1977) ; *Rodríguez* v. *N.A. Co. of America*, 96 D.P.R. 874 (1969) ; *Srio. del Trabajo* v. *Vélez*, 86 D.P.R. 585 (1962).

█ Careciendo de mérito el señalamiento en torno a la evaluación de la prueba, examinemos el relativo al derecho aplicable. La controversia fundamental planteada y sobre la cual versan directa e indirectamente los restantes señalamientos de la recurrente se pueden resumir en la siguiente interrogante: ¿los fondos depositados por Giraud Martínez

---

durante la vigencia de dicha cuenta; (5) concluir como cuestión de hecho y de derecho el que la cuenta de ahorros objeto de la presente demanda en este caso fue un contrato celebrado entre don Ramiro Giraud Martínez y el Banco del demandado-recurrido, excluyéndose a la recurrente como depositante con derechos exactamente iguales a los de Don Ramiro Giraud Martínez; (6) negarse a aplicar el derecho y jurisprudencia que gobierna el contrato y la relación entre los contratantes en el presente caso; (7) resolver, como resolvió que el derecho aplicable al presente caso lo es exclusivamente nuestro Código Civil; (8) concluir que la donación en el presente caso no sufrió efectos legales, no empece el haber concluido, como cuestión de hecho, que hubo una donación entre el codepositante Ramiro Giraud Martínez y la recurrente; (9) en su interpretación del contrato existente entre la recurrente y Don Ramiro Giraud Martínez, de una parte, y el Banco demandado-recurrido, de otra parte, al concluir que la recurrente no podía retirar dinero de la cuenta de ahorros en vida de Don Ramiro Giraud Martínez; (10) concluir que el contrato mediante el que la recurrente, Ramiro Giraud Martínez y el Banco recurrido abrieron la cuenta de ahorros objeto del presente caso, se rige por las disposiciones de nuestro Código Civil relativas a la sucesión testamentaria; (11) concluir que el Banco recurrido entregó indebidamente a la recurrente la suma de $3,812.50, declarando así con lugar la reconvención formulada por el Banco recurrido sin que éste presentare prueba testifical, documental ni de tipo alguno para sostener las alegaciones de tal reconvención, como concluye el propio Tribunal en su sentencia."

en la cuenta de ahorros mancomunada, a la luz del contrato ([6])
y las circunstancias del caso, constituyeron una donación
ínter vivos a su sobrina Lage como cotitular, en virtud de la
disposición contractual que proveía y reconocía "el derecho de
sobrevivencia"? ([7]) Su contestación exige una breve exégesis

---

([6]) "[Cuando] una persona entra en relación con un Banco, éste le
abre una cuenta, y se dice que 'opera' con ese Banco. En realidad, esa
relación es, indudablemente, una relación jurídica y, por tanto, un con-
trato." Garrigues: *Contratos Bancarios*, 29 (1958).

([7]) En los Estados Unidos se han debatido profusamente disputas simi-
lares. Kepner, *The Joint and Survivorship Bank Account—a concept without
a name*, 41 Calif. L. Rev. 596 (1953); Kepner, *Five More Years of The
Joint Bank Account Muddle*, 26 U. Chi. L. Rev. 376 (1959); Note, *Disposi-
tion of Bank Accounts: The Poor Man's Will*, 53 Colum. L. Rev. 103 (1953);
Comment: *Bank Deposits as Will Substitutes in Missouri*, 28 Mo. L. Rev.
482 (1963); Note, *Joint Tenancy Bank Accounts Inter Vivos Right*, 23
Baylor L. Rev. 141 (1971); Anno.: *Joint Savings Account—Gift to Sur-
vivor*, 43 A.L.R.3d 971. Michie, *Banks and Banking*, Vol. 5A, Ch. 9, Sec. 46,
pág. 125 (1971); Michie, *supra*, Vol. 8, Ch. 16, Sec. 17, pág. 55; 38 Am.
Jur.2d, Gifts, Secs. 7-11. A esos efectos, algunas jurisdicciones han aprobado
leyes que específicamente proveen directrices para la solución de las mismas.
Anno.: *Joint Savings Account—Gift to Survivor*, supra, 1007-1014; Michie,
*supra*, Vol. 5A, Ch. 9, Sec. 46, págs. 125-127. En otras, al evaluarlas los
tribunales, se han considerado una serie de factores, entre los que se en-
cuentran: 1) la verdadera intención de las partes al abrir la cuenta,
*Staples* v. *Berry*, 85 A. 303 (1912); *Sullivan* v. *Hudgins*, 22 N.E.2d 43
(1939); *McLeod* v. *Hennepin County Sav. Bank*, 176 N:W. 987 (1920);
*Christenen* v. *Ogden State Bank*, 286 P. 638 (1930); *Re Brozenic's Estate*,
204 A.2d 918 (1964); *Corkum* v. *Salvation Army of Massachusetts, Inc.*,
162 N.E.2d 778 (1959); *Bachmann* v. *Reardon*, 88 A.2d 391 (1952); *Maier*
v. *Bean*, 189 So.2d 380 (1966); *Re Chase's Estate*, 348 P.2d 473 (1960);
2) la fraseología de la cuenta de depósitos o de la tarjeta preimpresa su-
plida por el Banco, contentiva del acuerdo, *Graves* v. *Graves*, 192 N.Ed.2d
616 (1963); *Re Estate of Zabek*, 269 A.2d 490 (1970); *Ottjes* v. *Littlejohn*,
285 S.W.2d 243 (1956); Anno.: *Joint Savings Account—Gift to Survivor*,
supra, 1017-1021; 3) la relación de las partes; *Kelly* v. *Woolsey*, 170 P. 837
(1918); *Flynn* v. *Hinsley*, 113 A.2d 351 (1955); *Helfritz* v. *Riegle*, 24 Fla.
Supp. 95 (1965); *McLeod* v. *Hennepin County Sav. Bank*, supra; *Graves* v.
*Graves*, supra; Anno.: *Joint Savings Account—Gift to Survivor*, supra,
1043-1046; 4) El uso y manejo de los fondos durante la vida del occiso;
*Phoenix Title and Trust Co.* v. *King*, 121 P.2d 429 (1942); *White* v. *Bank
of America Nat. Trust and Sav. Asso.*, 128 P.2d 600 (1942); *Murray* v.
*Gadsen*, 197 F.2d 194 (1952); *Hall* v. *Hall*, 71 S.E.2d 471 (1952); *Wrem*
v. *Daniels*, 106 S.E.2d 126 (1958); *Chase Federal Sav. and Loan Assn.* v.
*Sullivan*, 127 So.2d 112 (1960); *Frey* v. *Wubbena*, 185 N.E.2d 850 (1962);
Anno.: *Joint Savings Account—Gift to Survivor*, supra, 1039-1043; 5)

de las normas y principios que regulan la "donación" según nuestro Código Civil, único cuerpo de ley que rige el análisis del contrato suscrito por las partes.

## II

En su trayectoria histórica, la donación en nuestro país la heredamos de España y se encuentra reglada en los Arts. 558 a 598 del Código Civil (31 L.P.R.A. secs. 1981–2053). [8] Su abolengo se remonta al derecho romano clásico, que la consideraba "una especial causa justificativa de una atribución patrimonial." [9] La raíz etimológica latina de la palabra "doni datio" (dación gratuita) tiende a ilustrar y dar una idea sencilla de lo que representa, aun cuando los estudiosos están acordes en que "la multitud de formas bajo las que la idea de liberalidad y la donación se manifiestan en la vida

---

si hubo una entrega de lo donado, aunque fuese simbólica; *White* v. *Bank of America Nat. Trust and Sav. Asso.*, supra; *Howard* v. *Farmers Bank*, 268 A.2d 870 (1970); *Flynn* v. *Hinsley*, supra; *Drinkhouse* v. *German Sav. and L. Soc.*, 118 P. 953 (1911); *Rutchic* v. *Salute*, 179 N.W.2d 607 (1970); Anno.: *Joint Savings Account—Gift to Survivor*, supra, 1033–1039; 6) si los depositantes tenían pleno conocimiento de los efectos legales que conllevaba mantener una cuenta de ahorros conjunta; *Re Estate of Bors*, 228 N.E.2d 127 (1967); *In Wood* v. *Nilsson*, 238 N.E.2d 277 (1968); *Re Estate of Zabek*, 269 A.2d 490 (1970); Anno.: *Joint Savings Account—Gift to Survivor*, supra, 1049–1054; 7) si existía alguna razón en particular para la apertura de la cuenta, Anno.: *Joint Savings Account—Gift to Survivor*, supra, 1021–1032; 8) si el depositante fallecido dispuso testamentariamente de los fondos habidos en la cuenta de ahorros conjunta; *Re Chase's Estate*, supra; *Re Cronholm's Estate*, 186 N.E.2d 534 (1962); *De Pasqua* v. *Bergstedt*, 247 N.E.2d 354 (1969); Anno.: *Joint Savings Account—Gift to Survivor*, supra, 1047–1049.

[8] Sobre el contrato de donación, véanse: Castán, *Derecho Civil Español, Común y Foral*, tomo 4, Décima Edición, 204–268 (1977); Scaevola, *Código Civil*, tomo II, Vol. 11 (1943); Manresa, *Código Civil Español*, tomo 5, 122–280 (1972); Puig Brutau, *supra*, 59–117; Puig Peña, *supra*, 189–219; Borrell y Soler, *Derecho Civil Español*, tomo III, 395–421 (1955); Espín Cánovas, *Manual de Derecho Civil Español*, Vol. III, Cuarta Edición, 517–528 (1975); Diez-Picazo y Gullón, *Instituciones de Derecho Civil*, Vol. 1, 471–484 (1974).

[9] Puig Brutau, *op. cit.*, 60.

del Derecho", (¹⁰) hacen difícil y complejo trazar los linderos entre su noción jurídica correcta y aquella no apropiada. Así en Roma, bajo el derecho *primitivo*, el concepto conllevaba la traslación de una propiedad acompañado de un motivo o sentimiento de liberalidad. En época de Justiniano, el simple consentimiento, escrito o no, perfeccionaba la donación, siendo su entrega exigible por el donatario. Advertimos como se avanza del concepto original representativo de un hecho consumado (entrega)—que si no se realizaba no engendraba obligación—a uno en que el traspaso puede ser simbólico si se reduce a escrito, surgiendo entonces un convenio o pacto. No obstante, bajo ambos sistemas subsiste como denominador común el elemento o sentimiento de generosidad. (¹¹)

Estos principios y otros se fueron infiltrando en los antiguos "Fueros" y Códigos españoles y evolucionando hasta el día de hoy. Al presente el concepto donación representa un modo especial de adquirir la propiedad y dominio de bienes muebles e inmuebles. Conforme el Art. 558 del Código Civil, (¹²) la donación es un acto de liberalidad (*animus donandi*) mediante el cual una persona (donante) gratuitamente dispone de una cosa al sustraerla de su patrimonio y pasarla a otra quien la acepta (donatario). Supone un empobrecimiento del donante sin que medie una contraprestación y puede comprender no sólo cosas tangibles sino derechos. Manresa, *op. cit.*, 131; Puig Peña, *op. cit.*, 192. Aunque el Código Civil de Puerto Rico reconoce que las donaciones pueden hacerse entre vivos o por causa de muerte (Art. 559; 31 L.P.R.A. sec. 1982), siguiendo el enfoque español, prescinde del carácter distintivo de las donaciones mortis causa al preceptuar que las mismas siguen las reglas de la sucesión testa-

---

(¹⁰) Castán, *op. cit.*, 206–207.

(¹¹) Manresa, *op. cit.*, 124–125.

(¹²) "La donación es un acto de liberalidad por el cual una persona dispone gratuitamente de una cosa en favor de otra que la acepta."

mentaria; (¹³) estas últimas están refundidas y deben entenderse como legados ya que producen sus efectos por muerte del donante. Las donaciones ínter vivos las regula consignando que "se regirán por las disposiciones generales de los contratos y obligaciones en todo lo que no se halle determinado en esta parte" (Art. 563; 31 L.P.R.A. sec. 1986). Castán observa:

"Nuestro Código ha abandonado el sentido tradicional de la distinción entre las donaciones *inter vivos* y las *mortis causa,* y se atiene, cuando menos en su tenor literal, al sentido vulgar de la misma, pues contrapone las donaciones que hayan de producir sus efectos entre vivos (es decir, en vida del donante) y las que hayan de producirlos por muerte del mismo. Las primeras se rigen por las disposiciones de los arts. 624 a 656, y por las generales de los contratos y obligaciones (art. 621). Las segundas participan de la naturaleza de las disposiciones de última voluntad, y han de regirse por las reglas establecidas para la sucesión testamentaria (art. 620).

Hace notar De Buen . . . que la expresión del Código 'no es afortunada, y sólo puede interpretarse de modo acertado dando a la palabra efectos un sentido jurídico y no un sentido material, es decir, considerando como donaciones *inter vivos* aquellas que por revestir forma contractual (o ser donaciones por razón del matrimonio) obligan al donante en vida, aunque la efectividad de esa obligación se haga depender de una condición. Así, será donación *inter vivos* la donación contractual que se haga depender de la muerte del donante, siempre que el donante no se reserve el derecho de revocarla por su voluntad, ya que si tal hiciera, no existiría, en realidad, contrato ni verdadera obligación para él, y, por lo tanto, no podría decirse que la donación producía efecto jurídico'.

De acuerdo con esta misma idea, la jurisprudencia admite que en la donación *inter vivos* puede quedar aplazada la entrega de la cosa hasta la muerte del donante (donación *inter vivos post mortem*) y asimilando la doctrina del Código Civil a la de

---

(¹³) "Las donaciones que hayan de producir sus efectos por muerte del donante, participan de la naturaleza de las disposiciones de última voluntad, y se regirán por las reglas establecidas para la sucesión testamentaria."

nuestro antiguo Derecho, pone la nota diferencial entre ambas especies de donación en que, según dice la sentencia de 28 de enero de 1898, la donación *mortis causa* se hace por causa de muerte o de peligro mortal, sin intención de perder el donante la cosa ni su libre disposición en caso de vivir, al igual que sucede con las disposiciones testamentarias, mientras que las donaciones *inter vivos* son las que se hacen sin esta consideración, por pura bondad del donante y merecimiento del que recibe, aunque la cosa no se entregue de momento o se reserve la entrega *post mortem,* lo cual constituye una simple modalidad que no cambia la naturaleza del acto, siendo estas donaciones irrevocables." *Op. cit.,* 220–221.([14])

■ Del comentario transcrito aflora otra característica medular que diferencia la donación inter vivos y mortis causa, a saber, la "irrevocabilidad" del acto, significando ello que no puede quedar sin efecto por la sola voluntad del donante. Aunque es posible conceptualizar separadamente entre la *disposición* y la *ejecución* de la donación, resulta meridianamente claro que:

"El que dona para después de su muerte, dona, no lega. El solo nombre del acto, no constando claramente que sea distinta la voluntad, basta para la aplicación de las reglas legales referentes a las donaciones. Ahora bien: si el mal llamado donante no sólo dilata la fecha de la ejecución para el momento de su muerte, sino que, además, se reserva la facultad de revocar a su arbitrio la disposición, entonces el acto no es válido bajo la forma de contrato; hay en realidad una disposición *mortis causa* que exige las solemnidades del testamento."

.    .    .    .    .    .    .    .

Es preciso, pues, para que el acto deje de estimarse donación y sea considerado como disposición por causa de muerte, que los efectos del acto arranquen precisamente del momento de la muerte, y se determinen o nazcan por causa o con ocasión de ella; que antes no exista nada más que la expresión de una voluntad revocable a capricho, que sólo la muerte puede convertir en irrevocable, firme o definitiva." Manresa, *op. cit.,* 150–151.

---

([14]) En similar sentido se manifiestan: Puig Peña, *op. cit.,* 202–204; Manresa, *op. cit.,* 149–151.

■ Más adelante dicho autor destaca que "[l]a revocabilidad o irrevocabilidad del acto es, sin duda alguna, el carácter esencial que distingue las disposiciones entre vivos de las disposiciones mortis causa, llámense o no donaciones, sin que el hecho de fijarse como plazo o condición la muerte del disponente pueda cambiar su verdadero carácter. Ahora bien; el hecho de entenderse revocable o irrevocable la disposición, ha de deducirse de los actos y de la manera de obrar del interesado . . . ." *Ibid.*, 153. Puig Brutau atinadamente destaca que el mejor criterio para entender y evaluar el carácter de la donación "consiste en prestar atención al momento en que la donación se convierte en normalmente irrevocable." *op. cit.*, 101.

■ Por su pertinencia a la solución del caso de autos, el carácter irrevocable de una donación ínter vivos—en contraposición con una mortis causa—hay que confrontarlo también con las limitaciones dispuestas en los Arts. 577 y 581. ([15]) La primera referente a la prohibición de donar bienes futuros, y la segunda, la facultad de reservarse el donante el poder disponer de algunos de los bienes donados o alguna cantidad con cargo a ellos. Respecto a la reserva de bienes donados, ([16]) distinto al Código Francés—que bajo la norma *donner et retenir ne vaut*—declara nula toda donación entre vivos, en que medie reserva, el nuestro, siguiendo la orientación española admite una reserva *parcial* de disposición sin

---

([15]) Rezan:

"La donación no podrá comprender los bienes futuros.

"Por bienes futuros se entienden aquellos de que el donante no puede disponer al tiempo de la donación."

.    .    .    .    .    .    .    .

"Podrá reservarse el donante la facultad de disponer de algunos de los bienes donados, o de alguna cantidad con cargo a ellos; pero si muriere sin haber hecho uso de este derecho, pertenecerán al donatario los bienes o la cantidad que se hubiese reservado."

([16]) Referente a este aspecto véanse: Manresa, *supra*, 223–225; Borrell y Soler, *supra*, 408; Diez-Picazo y Gullón, *supra*, 481; Scaevola, *supra*, 832–844.

que se estime nulo el acto, *aunque rechaza la validez de la donación si la reserva es total.* Véanse: Rodríguez Adrados: *Donación con Reserva de Facultad de Disponer,* 16 Anales de la Academia Matritense del Notariado, 423–481 (1966) ; Meléndez José: *Las Donaciones en Pactos Especiales,* Rev. Der. Privado, 69–108 (Diciembre 1972).

El concepto, "no es que el donante se reserve los bienes o que queden determinados de éstos en su poder: lo que se reserva es una facultad o un derecho sobre los entregados al donatario". Manresa, *op. cit.,* 223. La razón básica que propugna la doctrina para considerar nula la reserva total de los bienes donados, es que "en realidad no existe donación entre vivos, pues no produce efectos, ya que ni el donatario disfruta los bienes, ni el donante se desprende irrevocablemente de ellos, pues el poder disponer durante su vida equivale a poder revocar por su sola voluntad hasta el momento de su muerte." *Ibid.,* 224–225. La reserva infinita y total representaría una espada de Damocles que anularía la eficacia de la donación; es una negación jurídica de la donación.

### III

Al confrontar estos principios con los términos del contrato suscrito por el causante Giraud, su sobrina la recurrente, Giraud y el banco recurrido, no podemos coincidir con su tesis de que es acreedora a los fondos existentes. No son determinantes los términos contenidos en el acuerdo respecto a: (1) ". . . una relación contractual estableciendo tenedores solidarios con derecho de sobrevivencia . . . ." y (2) que ". . . los suscribientes acuerdan entre sí y con ustedes que todos los fondos depositados o agregados a la cuenta por cualquiera de las partes *son y serán considerados una donación* y transferencia a las otras partes, a ser prorrateado en ese momento entre ellas en la medida de su interés en la cuenta."

Varios aspectos derrotan tal proposición. Primeramente, frente a tales disposiciones contractuales, merece

gran peso el testimonio de la propia recurrente al efecto de que la intención de su tío al abrir la cuenta conjunta era que ". . . si algo le pasara, la cuenta pasara a su nombre, *que si él moría el dinero pasara a nombre de ella.*" Dicha prueba, considerada correctamente por el tribunal de instancia—por ser parte de las circunstancias relacionadas y bajo las cuales se realizó el convenio([17])—reflejaba indubitadamente que no obstante lo expuesto en el contrato, la intención de Giraud Martínez era donarle ese dinero a la recurrente al momento de su muerte, lo que hemos previamente identificado como una donación mortis causa. "[P]or encima del carácter liberal de la atribución predomina la intención de señalar el destino *post mortem* de los bienes del donante afectados por la donación." Puig Brutau, *op. cit.*, 98. Véase: *Ab Intestato Nakdimen*, 83 D.P.R. 459, 469–470 (1961). Y segundo, aun excluyendo dicho testimonio y tomando únicamente lo expresado por Giraud en el contrato, anotamos que si bien donaba el dinero depositado y cualesquiera otros que depositara en el futuro, y la designaba cotitular de los mismos, tal manifestación de voluntad, no obstante haber sido aceptada por la recurrente, per se no calificaba jurídicamente el acto como una donación ínter vivos, ya que al aquél conservar la facultad de unilateralmente retirar la totalidad de la suma se reservó en vida un poder de disposición total indicativo y demostrativo de que no era un desprendimiento del patrimonio

---

([17]) En este extremo, el testimonio de la recurrente constituía prueba oral ajena a las condiciones de un contrato reducido a escrito. La norma general contenida en nuestra Ley de Evidencia sobre prueba extrínseca (Art. 25, 32 L.P.R.A. sec. 1668) prohíbe su consideración a menos que concurra una de las excepciones allí provistas. *Chaves* v. *Coop. de Crédito de Isabela*, 103 D.P.R. 892 (1975); *Miranda* v. *Editorial El Imparcial, Inc.*, 99 D.P.R. 601 (1971); *Rolón Marrero* v. *Rivera Malavé*, 85 D.P.R. 731 (1962); *Rossy* v. *Tribunal Superior*, 80 D.P.R. 729 (1958); *Bigas* v. *Monforte*, 76 D.P.R. 309 (1954). Coincidimos con el tribunal a quo de que en el caso está presente una de tales excepciones, a saber, que la prueba oral presentada, constituya ". . . evidencia de circunstancias bajo las cuales fue hecho el convenio, o con las cuales se relacionare . . . ." Estuvo justificado en darle valor probatorio a este testimonio.

irrevocable. En resumen: en estricto derecho la donación, en vida, no se materializó y además era nula. Los términos del contrato suscrito y las circunstancias envueltas se resisten a encajar en el molde del Código Civil correspondiente a una donación inter vivos al evidenciar una permanencia en el dominio y libre disposición de la cuenta por el aquí donante, y un deseo de no perderla durante su vida. Su calificación corresponde a una donación condicionada a la muerte del disponente, para cuya validez era menester se guardaran las solemnidades del testamento. "La inobservancia de este requisito de forma . . . determina la inexistencia de la donación." Castán, *op. cit.*, 223. Manresa, *op. cit.*, 148. Cualquier conclusión en contrario, como excepción a la norma pautada, corresponde al Poder Legislativo.([18]) No hemos de inyectar a nuestro derecho sucesorio criterios de otras jurisdicciones, sobre los cuales no hay doctrinas mayoritarias.

En las circunstancias reseñadas, corresponde que clasifiquemos los fondos que permanecieron en la cuenta al momento de la muerte de Giraud Martínez como parte de su caudal relicto a ser distribuido entre sus herederos luego del pago de las correspondientes contribuciones. Robustece esta solución el contenido de lo que constituye "caudal relicto bruto" en la Ley de Contribuciones sobre Caudales Relictos y Donaciones de Puerto Rico (13 L.P.R.A. sec. 5002 y ss.), en el sentido de que pertenecen y corresponden a tal concepto los fondos que una persona en vida hubiese depositado en una cuenta bancaria mancomunada con otra persona, a pesar de

---

([18]) Varias leyes especiales consagran un trámite particular para la designación de beneficiarios o sobrevivientes respecto a ciertos fondos, sin las formalidades de testamentaría. Véanse: Sec. 14 de la Ley Núm. 133 de 28 de junio de 1966, según enmendada, conocida por la "Ley de la Asociación de Empleados del Estado Libre Asociado de Puerto Rico" (3 L.P.R.A. sec. 862m); y el Art. 11.330 de la Ley Núm. 77 de 19 de junio de 1957, conocida como "Código de Seguros de Puerto Rico" (26 L.P.R.A. sec. 1133).

que en la misma se provea el derecho de sobrevivencia a favor del otro titular de la misma. ([19])

*Se dictará la correspondiente sentencia confirmatoria.*

___

([19]) Reza:

"(f) *Bienes Mancomunados (joint interests).*—El caudal relicto bruto incluye el valor de toda propiedad hasta el límite de la participación poseída en mancomún por el causante y cualquiera otra persona *y lo depositado con cualquier persona dedicada al negocio bancario a nombre del causante y cualquier otra persona y pagadero a cualquiera de los dos o al que de los dos sobreviva, excepto aquella parte que se demuestre al Secretario haber pertenecido originalmente a dicha otra persona y nunca haber sido recibida por ésta del causante por menos de su valor.*" 13 L.P.R.A. sec. 5031 (f). (Bastardillas nuestras.)